Good morning, or afternoon by this point. If it pleases the Court, I'm Sean Sparks. I'm arguing on behalf of the Pennsylvania Public Utility Commission. I'm going to reserve two minutes for rebuttal, please. Yes, sir. This Court's October 23 letter to the FCC neatly summarizes the dispute between the PAPUC and AT&T. The PAPUC respectfully submits that it has the authority to apply appropriate federal law in these circumstances to resolve issues presented by the core complaint. The PAPUC has the authority under Pennsylvania law to resolve complaints between Pennsylvania public utilities, Pennsylvania residents. That is our core function in regards to complaint resolution, and we believe that we did exactly what the FCC asked us to do in this circumstance. One of the things I thought perhaps you might have emphasized maybe more in your briefing was that the 96th Act did talk about cooperative federalism. At least, we've had cases that have said that. Indeed, it does. There's not a whole lot you mentioned about it, and I was curious as to why. There's been a great deal of ink spilled over how that interaction is to work, and in this particular circumstance, we can look directly to paragraph 79 of the ISP remand order. In 2001. In 2001, that explains how that is to function, and the FCC explained if you have an expiring or expired agreement. If you've got an expired agreement, you don't have an agreement. You're going back to another carrier to try to establish a new agreement. If you've got this issue and you disagree over whether or not you have ISP-bound traffic, how much it is, where do you go? You go to the states, and the state commissions can adjudicate whether it is ISP-bound, how much it is, and what the appropriate rates are going to be for that traffic. And the discretion, at least in this instance, what the FCC has instructed the states, because this is special traffic, we are going to establish a rate cap. And if you had an agreement that was under the rate cap, you want to establish an agreement under the rate cap, you can do so. Don't go above the rate cap, because we've brought this under our authority. And to that, in this adjudication, we said, okay, fine, that's what we'll do. We'll establish a rate that's under that cap. We figured out, in this case, we made factual findings. Some of the traffic was VOIP traffic. Some of it may have been interstate. We cleared that all up. We figured out how much was ISP-bound. We looked at the federal rate. We applied the rate. End of story. We did what we were supposed to do. I didn't think we had to go any further than that in delving deeply into this federal-state dual sovereignty, because it's pretty explicit in what the FCC has explained to us and what they wanted the states to do. The AT&T's argument, one of its arguments, is that the commission didn't really apply federal law. It just applied a federal cap rate, and they're claiming that that's rate making. What was your response to that? We really did not engage in rate making, per se, as we engage in rate making. The FCC set that capped rate. And it really doesn't make much sense to argue that the FCC established the cap. Well, why did they establish a cap if it was some, you know, you could drift around or establish some other rate based on TELRIC pricing or some other price mechanism? You can't. You have to be below what they established as the effective rate. Six cents per minute of use. That would have been okay as well? It's a range. And in the ISP remand order, it's very clear. If states have already established a zero rate, that's okay. If you are somewhere in between, also okay. Can't go over the cap. And we, in Pennsylvania, decided, okay, triple 07, that's the number that we are going to apply in this circumstance. It is 0.0007. Yeah, triple 07. Yes, yes. Seven ten-thousandths of a cent. Right. So we didn't engage in an analysis of what should be done in terms of rate making. That was part of when we initially challenged that rate. The FCC, they have the authority to set that range. And we are effectively doing their bidding and not setting some independent rate. Any questions, Tom? Jane, any questions? No. We'll get you back on rebuttal then. Unless there's something else you want to emphasize before you sit down. The piece of this that I just wanted to really make sure that we are clear on is that a lot of this has to do with what happened in the Ninth Circuit with the FCC amicus brief and how that played out. And that's the best guidance that we have. And there, California, PacWest, they're arguing that, hey, this only applies in ILEC to CLEC relations under 250. And the answer to that was absolutely not. It applies to everyone, all LECs. The traffic is the issue, not the carriers, not the status of the parties. It's the traffic, special treatment for this traffic. And they were very clear that it explained that the Section 250 proceeding was only one way to address these disputes. It wasn't the only way. They wanted the states to deal with this particular traffic in a way that was ‑‑ I guess there's being raised a jurisdictional question. Is there not in our case? Yes. And that really wasn't ‑‑ they didn't reach that issue in PacWest? They did not get to that core issue of whether the FCC has spoken to that specific issue. And it's our mind that, you know, yes, it would be nice and neat if we had that ribbon on top of the package  We have eight years' worth of orders that establish a procedure that the states are to follow, and we followed it. And it was the concern with inconsistency with the ISP remand orders, not with the states acting as the FCC wanted them to act. It was conflict. It was not that we were doing their bidding or acting in this administrative role. Thank you. The FCC had a position in PacWest? Yes. Yeah. Does that have any bearing on what we're doing today here? The FCC's position in PacWest? Yes. You know, I think the instructive piece of that in the FCC amicus brief, and this is at the bottom of page 9 flowing into the top of page 11, that they're saying to the extent that we have preempted the states in this context, we have preempted inconsistent state regulation of ISP traffic. Inconsistent. And that really is kind of the key piece. Is the PAPUC acting in a way that's inconsistent with what the FCC has told us to do? I think the answer here is no, we're not. They've established that rate cap to be used in these state adjudications. That's what happened. Much like, you know, this is the second time that the PAPUC is before you in very short order here, dealing with this issue of looking to federal law as a part of its own adjudications. And this case kind of brings us, we didn't make up anything. We didn't interpret federal law in some new way. This is clearly we did what the FCC wanted us to do in a very straightforward way. Thank you.  Mr. Vandenberg. Good afternoon, Your Honors, and may it please the Court. I am Chris Vandenberg, Counsel for Co-Appellant Court Communications, Inc., in these cases. Just a preliminary question. Yes. How does court benefit from being able to file a complaint with the Pennsylvania PUC rather than the FCC? How does court benefit? I think that probably it would just, I'm not sure that there's any benefit. I'm not sure that the FCC generally takes cases like this. They may. I think back in 2009 when we filed our complaint, it just seemed in many ways the most logical place to file the case. So I'm not aware that there's any specific benefit to going to the PUC rather than the FCC. Do you know why the decision was made to file with the PUC? I think we just presumed that the State Commission had jurisdiction. We were both certificated LECs. That seemed like the most logical place to go. It has exclusive jurisdiction or parallel jurisdiction with the FCC? Well, that's an interesting question. In the 1996 Act, of course, there's a kind of cooperative federalism, which you referred to earlier. And there's case law. In fact, there's three cases where circuit courts have reviewed instances like this one where one carrier, like AT&T here, complained that a State Commission overstepped its boundaries in this cooperative federalism world when it adjudicated ISP traffic issues. And that's the First, the Second, and the Ninth Circuit. And in all three of these cases are premised on the common finding that the ISP remand order did not preempt the field of compensation for ISP traffic, but only established federal rules and policies against which State Commissions may not issue inconsistent rulings. As posed by all three of these courts, the issue is one of conflict, not field preemption. And just to go through them, in GlobalMaps I, the First Circuit upheld a Massachusetts Commission order that approved a carrier's petition to charge what are called intrastate originating access charges for ISP traffic. And this ruling arguably conflicted with the ISP remand order in two ways. First, the State Commission ordered the terminating party to compensate the originating party, whereas the ISP remand order contemplated rate caps on terminating traffic and never contemplated charges for originating traffic at all. And secondly, the State Commission in GlobalMaps approved per minute rates for ISP traffic many times greater than the FCC's ISP rate cap of 0007 that we referred to earlier. Now, the ISP traffic in GlobalMaps was just as much interstate as the traffic at issue here is. Yet the First Circuit approved the Massachusetts Commission's initiatives, which are far more extensive than anything the Pennsylvania Commission did in this case, because the court said, quote, the question before us is whether the FCC intended in the ISP remand order to exercise its jurisdiction over the precise issue here to the exclusion of state regulation. The First Circuit concluded that there was no conflict because the FCC had never clearly preempted State Commission's ability to impose intrastate access charges on ISP traffic. What about our statement that in the MCI case, that what we said that regulating local telecommunications competition under the 96 Act no longer is an otherwise lawful or otherwise permissible activity for the state. Rather, it is an activity in which state and state commissions are not entitled to engage except by express leave of Congress. Yes, Your Honor. The MCI case, yes. Obviously, that wasn't the whole of the case. Right. But nonetheless, it is a fairly direct statement. Correct. Correct. That is very broad language. And that case arose, as you know, Judge Roth and Judge Ambrose, in the context of Section 252 and the question of… Sovereign immunity. Sovereign immunity. Thank you very much. So Section 252 is very different from Section 251. Section 252, Congress set forth a very detailed scheme for how state commissions would have a specific role in implementing what are called interconnection agreements between incumbent carriers and competitive carriers. And that is a very specific role. And within the confines of that Section 252, I think it's clear that Congress did not intend for states to have any other authority or any other role other than the extensive role that was being given to them in 252. Section 251b-5 is the basis for reciprocal compensation for the FCC's ISP remand order and also the, I guess, statutory rubric within which Pennsylvania acted. 251 is structured very differently from 252. 251 sets forth general duties to which carriers of different kinds must hew, including Section 251b-5, which says that all local exchange carriers, including AT&T and CORE, should enter into reciprocal compensation arrangements. Now 251 says, 251d says how this should be implemented. And it says that the FCC should implement regulations to implement Section 251. And then it says states may also issue regulations and rules, so long as those are consistent not only with Section 251 but also with the FCC's rules implementing that section. So I think that the key distinction with the MCI case from 2001 is Section 251, we're not in the Section 252 world here in this case. And I just, going back to the question of jurisdiction, in Global NAPCS, what's called Global NAPCS 2, even though it was issued in the same year as Global NAPCS 1, the Second Circuit spoke directly to the issue of subject matter jurisdiction. And it said, quote, the classification of ISP bound traffic as interstate does not in itself. Yes, sir. You're, in fact, asking us to take the first pass at discerning the state's role in the context of this type of competitive scheme, say, correct? Yes, Your Honor. I think there's a very specific question here, and I think it's clear from the order that the FCC intended for state commissions to implement disputes over identification and compensation for ISP traffic. This has been very well documented in the Section 252 context, ILEX and SELEX, just because that's a very common dispute. That's where most of the activity is in terms of litigation. But, yes, there is a specific question before you. In the terms of SELEX, SELEC disputes over ISP traffic, I would submit that the only logical way to read the ISP remand order is that state commissions, similar to their role in ILEX, SELEC disputes, have the dispute to or have the authority to basically to handle these types of disputes. Why don't we hear from Mr. Comstock, and then we'll get you back on the phone. I'm sorry, Mr. Comstock? Yes, he is, Your Honor. Okay, great. Good morning, Your Honors. Chris Comstock for Appalese AT&T Corp. and Teleport Communications of America. AT&T's position in this case is that the FCC has exclusive jurisdiction over the traffic at issue. Now, the PUC and CORE throughout these proceedings have tried to shift the focus away from that. Back to the point that was made to us before. If it is the FCC that has exclusive jurisdiction, are you aware of even one instance where the FCC resolved a dispute between, as here, two SELEX that are involved in a rate dispute over local traffic? I am not, Your Honor. I mean, I realize it's interstate, but it's local traffic. Right. It's locally dialed traffic, but it is jurisdictionally interstate, as you have seen. And I think the reason for that is that most of these disputes. Jurisdictionally, isn't it mixed jurisdiction? It is not, Your Honor. And the FCC found that in the ISP remand order, affirmed that in the ISP mandamus order, and the D.C. Circuit affirmed that in its CORE communications decision from 2010. The Ninth Circuit also affirmed that in its 2011 PAC-West decision, that this is purely jurisdictionally interstate traffic. PAC-West didn't deal with it. In the FCC, we invited them to weigh in, and they're silent on this issue. I mean, one could make a good argument that that silence indicates that they're not, for lack of a better word, trying to protect a type of turf, if you will, and they're willing to let the state PUCs deal with issues, as long as they don't go above the amounts that are set as rates by the federal government. In this case, the FCC. I think that's not quite right, Your Honor, and I think that the reason for that is that the core of AT&T's argument here is that the structure of Section 251 requires that state commissions have authority to require incumbent carriers to enter into interconnection agreements with competitive carriers, but it does not require competitive carriers to enter into agreements with other competitive carriers, and that is the basis for the jurisdictional distinction in this case. So if it's important for the FCC to retain exclusive jurisdiction, then why hasn't it spoken clearly on this issue? And I think the reasoning, the key is the language that the FCC used. In both what it submitted, the amicus brief it submitted in the Ninth Circuit and the letter it submitted in this case, the FCC said, our rules and orders have not spoken to this issue yet. Now, what that means is that the ISP remand order. As recently as this month, they're reiterating. Yes, and I think that's exactly right. They're not speaking to this issue. I think that's exactly right. The ISP remand order did not speak to the issue. The jurisdictional distinction here comes from Section 251, which is a statute. So the jurisdictional question here is statutory, and thus it's within the Ninth Circuit's competency, and it's within the competency of this Court. It's not something that the FCC needs to weigh in on with an amicus brief because the FCC did not preempt state authority here. The 1996 Act preempted state authority. As this Court recognized in the MCI case from 2001, and as Justice Scalia and the Supreme Court recognized in the Iowa Utilities Board case from 1999, all matters that are within the scope of the 1996 Act have been federalized, and the state commissions have only the power that has been delegated back to them by the FCC or by Congress through the 1996 Act. So the FCC hasn't delegated any power back to the state commissions here. Let me pick up on Judge Ross' question. Might it be true that a matter can be subject to FCC jurisdiction? Judge Ember, I can't hear you. Can you hear me now? Can you hear me? Okay, I can hear you now. Okay, we'll try again. I'm sorry, I was picking up on the question that you had asked earlier. Isn't it true that a matter can be subject to FCC jurisdiction without the FCC actually exercising that jurisdiction, but allowing others to partner with it so long as they carry out FCC policies? In effect, your question being that there might be a parallel jurisdiction or a dual jurisdiction? Absolutely, Your Honor, and there are certainly instances in the 1996 Act where that's the case. But I think what needs to be focused on here is the structure of Section 251. 251 sets out duties of incumbent carriers in Section 251C and specifically requires incumbent carriers to negotiate and arbitrate an interconnection agreement with competitors. Now it sets out general requirements for all local exchange carriers in Section 251B, and it did not require that competitive carriers enter into interconnection agreements with other competitors. Now the PUC in this case, their orders effectively required AT&T to enter into an agreement with CORE. They set a rate, and they set the rate at the cap that the FCC had, but they still set a rate. You asked the CORE and the PUC whether they set a rate in this case, and they said, well, we sort of did, but we sort of didn't. But that's not true. They clearly set a rate in this case. And under the ISP remand order, the FCC contemplated that even in instances where state commissions have jurisdiction because they're arbitrating interconnection agreements between an incumbent and a competitive carrier, the state commissions are going to set the rate. That's what they do. I can't hear. Sorry. Is this better, Judge Roth? Can you hear me now, Judge Roth? No. Hello? I can't hear anything now. Hello? Let us take a couple minutes, and Jane, if you'll have it redialed up, if you wouldn't mind. We'll take a recess. I can't hear you. Okay. Yeah. Good. We'll take a recess, redial, and try again. Can you hear that? Okay. Great. Thank you. Yeah, I can hear that. Please rise. This court is adjourned. Thank you. Thank you.  Hello? Hi, Pat. Yes. Okay. Well, it said it doesn't appear to be specific to the portal. I can list it as C-squared, but it's wrong. There's an angle between it and the arrow.  All right. It is C-squared. Okay. All right. Can you give me your cell phone number? Okay. We're now connected. It's not muted, so I can't hear you. Thank you very much. Hey, Craig. We have reconnected. Hi, Judge. Yeah. Okay. I'm hearing you loud and clear now. Okay. Would you like me to get the other panel members? Yeah. Okay. Yeah. Why don't we go ahead? All right. Thank you, Judge. Thank you. All right. I think it's fine. Okay. Good.          All right. Okay.  All right. Good. Good. Good. Good. Good. Good. I've heard the clap sound. Good. Good. Okay. Okay. We're going to try it again. Judge Roth, can you hear me? I can hear you fine now. Jane, can you hear me? I can hear you fine, yeah. Okay. We'll pick up where we left off. Okay. And one of the points that I think is important in this case is that the PUC has said that they were merely applying or enforcing federal law, but in actuality, the PUC's orders violated and conflicted with federal law in five different ways. And I think the first way we've discussed, at least in part, which is federal law, 251 and 252, provide that only an incumbent carrier can be required to enter into an interconnection agreement with another carrier. And that's essentially what the PUC did in this case. It required two competitive carriers to enter into a contract with each other, and it decided what the rate should be, just as if it were arbitrating a contract between an incumbent and a competitive carrier. So in that sense, the PUC's orders really did violate Section 251. So if the 96 Act is silent, can the – and the – if the 96 Act doesn't say whether this type of arrangement is covered, why can't the FCC, in effect, by its inaction, allow somebody to – back to my words – Judge, Judge Ambrose, I'm not hearing your question. Can you hear me now? I'm not hearing your question. Okay. I'm sorry. I'll get closer to the mic. If the – did – back to my point, which I made earlier, can a matter be subject to FCC jurisdiction without the FCC having exercised that jurisdiction, but it allows another to partner with it in order to carry out FCC policy, principles, rates, et cetera? Certainly, Your Honor. But I think in this case, what we're dealing with here is setting a rate for interstate traffic. And this is the sort of thing that has been at the core of the FCC's exclusive jurisdiction since 1938, when Section 47 – Then I can see the problem. But if they go exactly at the FCC rate or go below it, is that a problem? It is a problem, Your Honor, because the Communications Act has always assigned the rate making for interstate traffic to the FCC exclusively. That's been decided in many court cases that are cited in our brief. It's been decided by the FCC. The FCC has said we have exclusive jurisdiction to set the rate for interstate traffic. But can't somebody else implement that jurisdictional grant of rates? Not unless the FCC delegates that expressly to a state. And this Court said as much in the MCI order at 271F3. Your Honor, but MCI was principally a sovereign immunity case. MCI was a sovereign immunity case, but a key issue in that case was the nature of the authority that had been given to the State Commission. And this Court, following with the Seventh Circuit and following the authority that the Supreme Court had set forth, found that the authority that State Commissions had is only what has been granted to them by the FCC and by Congress through the 1996 Act. So it's a gratuity. And if the states accept that gratuity, they've waived their Eleventh Amendment immunity. So this is not some preexisting authority that they have. They need to have it expressly delegated to them. And that's what this Court said in 2001. What's your thinking as to why the FCC hasn't come in and said just what you just noted to us? Well, I think, Your Honor, in the Ninth Circuit, that decision was easy to make. It was clear that the State Commission had acted in a way that expressly violated the express preemption principles in the ISP remand order. I can understand maybe why in 2011 the FCC didn't weigh in because they thought that there was an answer on another question. You didn't have to get to the jurisdictional question. But here they were specifically invited, and they've remained silent. Yes. Or taken no position. Why do you think that's the case? I think it's twofold, Your Honor. I think the FCC provided both answers in their letter to this Court. The first is that the PUC has filed a petition before the FCC, and the FCC doesn't want to prejudge the merits of that position through an amicus brief in this Court. And that's what they said in their letter. The second is that the FCC's rules and orders have not spoken explicitly on this issue. And what that means is that the ISP remand order did not specifically say, not only do State Commissions get to decide this as between incumbents and competitive carriers, they also get to decide this between competitive carriers and other competitive carriers. Because if they had said that in the ISP remand order, they would have answered this Court's question. They would have said, yes, our ISP remand order gives State Commissions authority to do this. But the ISP remand order was silent on that point. So we have to go back further. We have to look at the 1996 Act and say, does the 1996 Act expressly give State Commissions authority in this area? That's the test that was set out in MCI. And clearly the 1996 Act does not give State Commissions authority to set rates as between two competitive carriers. That's in 251C, that's specifically only a duty of incumbent carriers. Do you know how far along the FCC is in connection with the process of determining? The FCC has taken opening briefs and reply briefs, so the briefing period is closed. They have no statutory timeframe to issue a ruling. But what is typical? Do you think there's something likely to come out in early 2015? I would suggest not, Your Honor, for this reason. The FCC's 2011 Connect America Fund order ruled that there's going to be a transition to a bill-and-keep arrangement. What that means is no more reciprocal compensation for traffic that goes to a local exchange carrier. So within seven or so years, all of this is going to go away, including all of the ISP-bound traffic. There's no question that in the future, even from an incumbent carrier like Verizon. So all of this is going away, in addition to the fact that dial-up Internet traffic is just going away as a result of technological advancements. So I think this is probably- The amount at issue here isn't all that significant in terms of the players of 254,000, is that right? Yes, yes. So I would suggest that the FCC is probably not likely to answer that question anytime soon, but I'm reading the tarot cards there. I don't know that for certain. But as I said, the PC orders violate a federal law in at least five ways. I think I've mentioned the first way is violation of 251 by requiring competitive carriers to enter into a contract. The second way is that the FCC has been clear for competitive carriers, in order to recover interstate charges,  47 U.S.C. 203 requires carriers to tariff their interstate charges. And the FCC has said, well, incumbent carriers still have to tariff all your interstate charges, but competitive carriers, if you enter into a contract with another competitive carrier or an incumbent carrier, if you enter into a contract, you don't have to tariff. So you can either recover by a tariff or contract. But if you have neither a tariff or a contract, you can't recover. The FCC said that in the AT&T versus All-American case that we cited in our brief. So in this case, the PC allowed court recover, not just initially, but allowed them to recover four years back for traffic that had been terminated four years before, when they hadn't sent any bills to AT&T, and they had no tariff or contract in place. So the PC orders violated Section 203 and 201. The PC orders also violated Section 251b-5, which requires carriers to enter into inter-carrier compensation arrangements in order to recover. And it's clear that CORE here had no contract or tariff and thus had no inter-carrier compensation arrangement. So the PC orders also violated Section 251b-5. The PC orders also violated the federal doctrine of retroactive rate making, because there was no rate between these carriers. In 2009, CORE files this complaint. And in 2012 and 2013, the PC says going back to 2005, the rate was 0007. So they've retroactively increased the rate and required AT&T to pay that. And finally, the PC orders violated federal law at 47 U.S.C. 415, which is the two-year statute of limitations, because they imposed a four-year statute of limitations. So I think the PC orders actually conflict with and violate federal law. I also wanted to clear up one point here, which is that in its briefs, the CORE and the PC have both suggested that without having a remedy at the State Utility Commission, CORE would not be able to recover any charges here. And that's not true. As we've said, a carrier, in order to recover interstate charges for interstate traffic, needs to file either a tariff or a contract. So CORE either could have entered into a voluntary agreement with AT&T, or it could have tariffed its charges with the SEC. And the FCC would have been the only appropriate place to tariff these charges, because they're all interstate charges. So CORE could have recovered for its traffic if it had put a tariff on file and charged AT&T under that tariff. And if it had... A tariff on file with the PUC or the FCC? No, with the FCC, Your Honor. And CORE has a long-distance access charge tariff on file with the FCC, so it's certainly able to file tariffs with the FCC. It knows how to do it. It just didn't do it for ISP-bound traffic. And if it had, it could have... And AT&T violated the tariff by not paying it. It could have come before the FCC or before a federal court under 47 U.S.C. 207. So it would have had remedies had it followed the proper federal scheme. But by allowing it to recover outside of that federal scheme, the PUC violated federal law. What was the advantage to CORE in filing before the PUC? Well, Your Honor, as I've mentioned, the federal law requires a carrier to either tariff its charges or have a contract on file. So if you go before the... If CORE had gone before the FCC, I think the FCC would have said, you didn't have a tariff on file and you didn't have a contract, so you can't recover here. And the PUC didn't say that. So I think that was the obvious advantage here for them. And speaking of CORE's access tariff, I think jurisdictionally it's helpful to think of this traffic like long-distance traffic because if you have a carrier that sends a long-distance call to a long-distance carrier in Pennsylvania and that long-distance carrier takes it out of state, the PUC can't set a rate for that traffic even though it starts in Pennsylvania and it goes... It's handed off to a long-distance carrier in Pennsylvania because the FCC looks at the end-to-end analysis. It looks to the full scope of the call. The call travels across state lines. It's an interstate call. And there's no dispute here that the PUC would not have authority to set a rate for that kind of traffic. Now the same thing happens here. It's a locally dialed call to an ISP, to an internet service provider, but the FCC looks at the full end-to-end scope of the call. It says the call goes to the ISP and the ISP connects the call to websites that are outside the state of Pennsylvania and indeed all over the world. So it's the same analysis here and it's the same jurisdictional distinction that the FCC has exclusive jurisdiction over interstate traffic unless that's delegated to a state commission. And there's been no delegation here. So that is the gist of our argument. I think I've mentioned the fact that on the no delegation point, if the FCC had delegated authority to the state commission through the ISP remand order, it would have not said in its letter to this court that it had never spoken to the issue in its rules or orders. And it said that, so I think it's pretty clear that the FCC did not delegate any authority to the state commission in the ISP remand order. So unless the court has further questions. Thank you for your time. Thank you. Thank you. Mr. Sparks? You reserved what, two minutes? Yes, sir. Okay. Thank you. So I think there's a real benefit to coming before the PUC just in terms of due process. We're set up to handle adjudications. What about Mr. Compstock's point that if you're going to give jurisdiction, parallel jurisdiction, partnering jurisdiction, whatever you want to call it, that it has to be done expressly by the act or by the FCC itself? Well, you know, this is an interesting question about what's going on here, and we can look at this in the context of the MCI case. You can say, okay, states, you can do whatever the act says at the FCC's direction of how they're interpreting that act. Well, here they interpreted the act for this special converged traffic. That's their term because it's an interstate service that happens over a local call. It's converged. That's why we have special rules to deal with it. This is how you deal with it. So we are doing what they asked us to do according to their directions, entirely consistent with MCI. We're not off the reservation at all. This 251 issue with reciprocal compensations, the FCC has been very clear this traffic is under that regime. CLECs have an obligation to engage in these agreements. Now, this argument that AT&T is making is kind of fantastic, and I mean that in a pejorative sense because they're saying CORE had an obligation. That's a compliment. CORE had an obligation to form a contract with us if they want payment, and we have no obligation to return that favor, and therefore we get out from underneath this, and the PAPCs say no. The FCC has established a rate. A rate applies. We don't do free service in Pennsylvania. You have to pay for the respective pieces of your network until the FCC says otherwise. In the CAF order, we're moving to that place. We're not there. We certainly weren't there between 2004 and 2009 when this particular case, where traffic is coming before us, what we're addressing here. We're not talking about the future. We're talking about the past. And to a certain extent, it seems that they're really attacking the FCC's authority to establish the regime to deal with this traffic. It's a collateral attack on what the FCC did in the ISP remand order series of cases, and that's what they're upset with, not with what the PUC did in terms of enforcing the FCC's rules. Gee, they don't have the authority to let the states do this. Well, that ship has sailed. If you wanted to fight the ISP remand order in that series of cases, the window closed in 2008 with the mandate order when the FCC clarified what it expected and what it wanted. Thank you. Okay, thank you very much. Mr. Vandenberg. Starting with a question about the FCC potential ruling on the PAPUC's petition, I would agree with counsel for AT&T that FCC rulings can and often do take years to resolve, and the fact that there is an inter-carrier comp regime that's going to zero probably makes it less interesting to them. So those would be my quick thoughts on that. The tariff requirement. There's nothing in the ISP remand order about a tariff requirement that would even hint that filing a tariff with the FCC would be appropriate. In the instance where one CELAC tried to file an ISP traffic rate at the FCC, the FCC told it that, quote, any federal tariff purporting to govern inter-carrier comp for ISP-bound traffic could be reasonable only if it mirrors the applicable terms of the party's interconnection agreement as construed by the appropriate state commission. So to me, that does not speak of a requirement that CELACs go off and file ISP tariffs solely for traffic with other CELACs. That does not make sense to me. The issue of mixed jurisdictional traffic, Judge Roth alluded to that earlier, and jurisdictionally mixed traffic is essentially ISP traffic is the perfect example of jurisdictionally mixed traffic. It is local calls exchanged exclusively by state commission-certified LECs, local exchange carriers, with an interstate component of Internet access hanging off the end of the call. And the FCC did find that ISP traffic is, quote, well, I'm not quoting. The FCC did find that ISP traffic is jurisdictionally mixed and therefore classified it as interstate. That's the ISP remand order, paragraph 52. However, according to the Eighth Circuit in Quest Corp v. Scott, the fact that traffic is jurisdictionally mixed and therefore interstate means, quote, the FCC has authority to preempt state regulation of telecommunications where it's not possible to separate the interstate and interstate aspects, and where the commission concludes that a federal regulation is necessary to further a valid federal regulatory objective. And in that case, the Eighth Circuit said, quote, there is no dispute in this case that the FCC has the power to preempt states from establishing standards and requiring reports relating to special access. The fighting issue is whether the FCC actually intended to do so when it promulgated the 10 percent order. And again, that's Quest Corp v. Scott, Eighth Circuit, 2004. And I would submit that here the FCC has spoken in its order. It has implemented the concept of cooperative federalism and basically delegated or presumed the authority of state commissions to adjudicate disputes like the one before you today. Thank you very much. Thank you. Thank you to all counsel for well-presented arguments. We'll take the matter under advisement. I would ask also, as we have done in the prior two cases, that we have a transcript prepared of this oral argument and the cost to be split between CORE and AT&T. Mr. Comstock, quick question. Was Mr. Livingston initially supposed to argue this, or were you always? I had always submitted. Okay. He did have the first instance. Is this your first argument before a court of appeals? Yes, sir. As they say in South Philly, you've done good. Thank you, sir. Thank you. Thanks to everyone. We'll clear the courtroom, take a five-minute recess, because we're going to confer with Judge Roth here immediately after this oral argument. James, is that okay with you? The problem is the cafeteria closes in ten minutes. You want to go grab something at the cafeteria? Let's convene and, like, pick a time. Two-fifteen? Two-fifteen. Yeah, two-fifteen. Two-fifteen, okay. Thank you. Do you want to do it by phone? Which way? Please rise. This court stands adjourned until Thursday, November 20th at 10 a.m. Thank you.